**Thomas P. Smith, Jr.**
**Celeste Chase**
**Peter A. Mancuso**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-5562 (Mancuso)**
**mancusope@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> Plaintiff, <br><br> -against- <br><br> **SOLOMON LICHTENSTEIN,** <br><br> Defendant. | **COMPLAINT** <br><br> 25 Civ. 8742 (    ) <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC"), for its Complaint against Defendant Solomon Lichtenstein ("Defendant" or "Lichtenstein"), alleges as follows:

## SUMMARY

1. Lichtenstein orchestrated a fraudulent investment scheme by misrepresenting how he would use investors' funds, by falsely reporting their investment returns, and by misappropriating their investments for personal purposes.

2. From approximately July 2022 through August 2024 (the "Relevant Period"), Lichtenstein raised at least $2.7 million from over 25 investors—many of whom were Lichtenstein's

family members, neighbors, and friends—through two entities: Taraxa Capital Fund, LP ("Taraxa" or the "Fund"), a pooled investment vehicle, and Lightstone Trading Inc. ("Lightstone").

3. Lichtenstein, as investment adviser to the Fund, held out Taraxa as a hedge fund that invested in securities using a day-trading strategy that he claimed he had profited from personally. Similarly, Lichtenstein represented that money from Lightstone investors would be invested using the same trading strategy; however, instead of being subject to market risk, Lightstone investors were to receive a fixed interest payment of 5% per month, which was intended to be generated from Lichtenstein's trading returns.

4. Rather than invest all of the money he raised from Taraxa and Lightstone investors as promised, Lichtenstein misappropriated investor funds to pay for personal expenses, as well as to make Ponzi-like payments to satisfy redemption requests and interest obligations owed to other investors. Lichtenstein spent hundreds of thousands of dollars of investor funds on credit card payments, mortgage payments, bars, restaurants, travel, and cash withdrawals. To pay these personal expenses, Lichtenstein misappropriated approximately $868,000 from Taraxa and approximately $98,000 from Lightstone.

5. To the extent that Lichtenstein invested a portion of investors' money as promised, the overall rate of return on the trading was negative. In total, Lichtenstein's trades on behalf of Taraxa and Lightstone investors resulted in net losses of approximately $200,000. Rather than disclosing these losses to investors, Lichtenstein fabricated positive returns through online dashboards for Taraxa investors that falsely reported significant growth in the value of their investments.

6. In and around the summer of 2024, Lichtenstein's scheme collapsed when he ran out of investor money and admitted to several investors that he had used investor funds to pay his personal expenses. As a result of Lichtenstein's scheme, investors lost in the aggregate more than $1.5 million.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Defendant violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

8. Unless Lichtenstein is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

10. The SEC seeks a final judgment: (a) permanently enjoining Lichtenstein from engaging in the acts, practices, and courses of business alleged against him herein and from violating the federal securities laws and rules this Complaint alleges he has violated; (b) permanently enjoining Lichtenstein from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts; (c) permanently restraining and enjoining Lichtenstein from directly or indirectly, acting as or being associated with any investment adviser; (d) ordering Lichtenstein to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) &

78u(d)(7)]; (e) ordering Lichtenstein to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

12. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue is proper in the Southern District of New York pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Lichtenstein resided in Stony Point, New York, in Rockland County, during the Relevant Period. In addition, Lichtenstein transacted business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that Lichtenstein's operations were primarily located in Rockland County, New York and several Taraxa investors resided in Rockland County, New York.

## DEFENDANT

14. **Lichtenstein**, age 29, was a resident of Stony Point, New York throughout the Relevant Period but currently resides in Fort Lee, New Jersey. Lichtenstein is the founder and fund manager of Taraxa. He is also the manager of Taraxa Capital Group, LLC ("Taraxa Capital"), which serves as the general partner of Taraxa, as well as the founder and owner of Lightstone.

## RELEVANT ENTITIES

15. **Taraxa** is a Delaware limited partnership formed on November 9, 2022 with a principal place of business in Stony Point, New York. Taraxa was created to operate as a private investment partnership in which the Fund's investors would become limited partners.

16. **Lightstone** is a New York corporation formed on July 6, 2022 with a principal place of business in Stony Point, New York. Lichtenstein, through Lightstone, offered and sold notes to investors, the terms of which were set forth in documents nominally entitled "loan agreements."

## FACTS

### I. Background on the Relevant Offerings

17. In or around December 2022, after purportedly finding success trading securities for himself and a close friend, Lichtenstein left his job as a medical biller and began soliciting investments in Taraxa and Lightstone from family members, friends, and neighbors in his tight-knit religious community.

#### A. Taraxa

18. Lichtenstein, as Taraxa's fund manager, provided prospective investors in Taraxa with a Confidential Private Placement Memorandum ("PPM") and Limited Partnership Agreement (the "LPA"), both dated December 2022. Lichtenstein signed the LPA on behalf of Taraxa Capital as General Partner to the Fund, and signed the subscription agreement appended to the PPM.

19. Under the PPM and the LPA, Lichtenstein was "primarily responsible for the management" of Taraxa and solely vested with the authority for managing Taraxa's assets and making investment decisions for the Fund.

20. The PPM trumpeted Lichtenstein's qualifications as having purportedly spent "years honing his skills in multifaceted trading strategies using market analysis and risk mitigation."

21. The PPM and LPA also described Lichtenstein's day-trading strategy and stated that

the objective of the Fund was "investing in [s]ecurities."

22. Additionally, the PPM stated that Taraxa's "investment program is focused primarily on trading options and futures on indexes and exchange-traded funds ("ETFs") [and] aims for small, consistent returns using high-conviction trades that can capitalize on market volatility."

23. The PPM further stated that Taraxa's trades will typically "consist of selling options on a variety of ETFs on the major US exchanges using 0-date expiration contracts, trading only intraday based on market direction and daily analysis."

24. Under the LPA, Lichtenstein, through Taraxa Capital, was entitled to receive compensation in the form of a monthly management fee of 2% per year and an annual "Performance Allocation" of 20% on investor returns over 25%, and 40% on investor returns over 100%.

25. In addition to the PPM's and LPA's descriptions of the Fund's objectives and strategies, Lichtenstein made oral representations to Taraxa investors as to how he would use their money.

26. For instance, Investor A (a resident of Rockland County, New York) invested $40,000 in Taraxa in May 2023. Before this investment, Lichtenstein represented to Investor A that money invested in Taraxa would be pooled together in a fund and invested in securities.

27. Before Investor B invested $45,000 in Taraxa in December 2022, Lichtenstein represented to Investor B that money invested in Taraxa would be used for trading options and highly leveraged futures, but that he only invested certain portions of the money over short periods of time to reduce the risk of large losses.

28. Before Investor C invested approximately $100,000 in Taraxa in March 2023, Lichtenstein represented to Investor C that money invested in Taraxa would be used for strategic day-trading, that he would never leave money in the market overnight, and that investments would be limited to a certain percentage of the Fund's assets to minimize the risk of loss.

29. During the Relevant Period, Lichtenstein raised over $2.4 million from over 20 investors in Taraxa.

30. Most investors transmitted their investments by wire transfer to bank accounts held by Taraxa, in which their money was pooled with money from other Taraxa investors for the putative purpose of generating returns through Lichtenstein's trading on behalf of the Fund.

31. In return for their investments, Taraxa investors received limited partnership interests in the Fund.

**B. Lightstone**

32. As an alternative or additional way to invest, Lichtenstein offered investors the opportunity to purchase notes issued by Lightstone ("Lightstone Notes" or "Notes").

33. For each Lightstone investor, the terms of the Note were set forth in a document called a "Loan Agreement," pursuant to which the investor agreed to "loan" money to Lightstone in exchange for Lightstone's promise to repay the principal amount and interest at the fixed rate of 5% per month.

34. Lichtenstein signed these agreements on behalf of Lightstone.

35. Lichtenstein represented to prospective investors that the money invested in Lightstone would, as with Taraxa, be used for trading in securities.

36. Lichtenstein represented to Lightstone investors that they would receive a fixed 5% monthly interest payment.

37. Lichtenstein was entitled to keep any trading returns in excess of the 5% monthly payment owed to Lightstone's noteholders.

38. Lightstone investors understood based on Lichtenstein's representations that the promised interest payments would be funded with Lightstone's trading returns.

39. Investors purchased the Lightstone Notes expecting to earn profits in the form of

such interest payments.

40. Investors also had the option "not to collect the interest on any given month" and instead let it accrue to be calculated as part of the principal amount of their investment for the following month.

41. During the Relevant Period, Lichtenstein raised over $300,000 through the sale of Lightstone Notes to at least 10 investors, including several individuals who also invested in Taraxa.

42. Most investors transmitted their investments by wire transfer to bank accounts held by Lightstone.

## II. Lichtenstein's Scheme to Defraud

### A. Lichtenstein Misrepresented How He Would Use Money from Taraxa Investors

43. Contrary to the representations in the PPM and Lichtenstein's other communications with Taraxa investors that he would use their money to trade securities, Lichtenstein used the majority of the funds he raised for Taraxa for other purposes.

44. Of the over $2.4 million Lichtenstein raised for Taraxa, he transferred a mere $592,000 from Taraxa bank accounts to the brokerage account he used for trading securities—less than a quarter of the funds raised.

45. Rather than investing the remainder of the Taraxa funds raised in accordance with the PPM and his representations to investors, Lichtenstein misappropriated approximately $868,000 of Fund assets for personal use and used at least approximately $900,000 to make Ponzi-like payments to fulfill investor redemption requests.

46. These amounts far exceeded the management and performance fees that Lichtenstein would have been entitled to under the LPA.

47. Lichtenstein continued to use the PPM to solicit investors even after he had begun misappropriating Fund assets.

48. Frequently, Lichtenstein misappropriated Fund assets within days of soliciting a new investment in the Fund.

49. For example, on or around May 25, 2023, Investor A invested $40,000 in the Fund by wiring funds to a bank account held by Taraxa. By May 29, 2023, Lichtenstein began transferring that money to a personal bank account held in his name and spending it on department store purchases, restaurants and hotels. Lichtenstein also transferred a portion of Investor A's funds to a bank account held by Lightstone and used that money to make Ponzi-like payments to Lightstone investors.

50. In addition, on or around September 28, 2023, Investor D invested $10,000 in the Fund by wiring funds to a bank account held by Taraxa. On October 2, 2023, Lichtenstein transferred the majority of Investor D's money to a Lightstone bank account and used that money to make Ponzi-like payments to Lightstone investors.

51. On or around June 28, 2024, Investor E invested $40,000 in the Fund by wiring funds to a bank account held by Taraxa. On the same day, Lichtenstein transferred the entirety of Investor E's money to a personal bank account held in his name. Over the following two weeks, Lichtenstein used Investor E's money to make cash withdrawals, purchases at stores and restaurants, and Ponzi-like payments to other Taraxa investors.

52. Lichtenstein's misrepresentations regarding the use of investor funds were important to investors' decisions to invest in Taraxa.

**B. Lichtenstein Misrepresented Taraxa's Performance**

53. Taraxa's trades performed poorly. For 11 out of 16 months that Lichtenstein actually engaged in trading securities during the Relevant Period, Lichtenstein failed to generate profits on his trades.

54. Even though Lichtenstein did generate profits on his trades during some months, the losses he sustained during the losing months far exceeded these gains.

55. Indeed, after May 2023, the historical trading return for the Fund (since inception) was always negative.

56. In the aggregate, Lichtenstein incurred net losses of approximately $200,000 by trading securities in Taraxa's brokerage account.

57. By May of 2024, Taraxa's brokerage account had a balance of less than $100 due to Lichtenstein's unsuccessful trading, withdrawals he made to pay for his personal expenses, and disbursements he used to make Ponzi-like payments to investors.

58. Throughout the Relevant Period, Lichtenstein concealed Taraxa's trading losses from investors.

59. Lichtenstein repeatedly misrepresented the Fund's performance through oral statements to investors and other deceptive acts, including the creation of online dashboards that provided investors with information about the supposed performance of their investment in the Fund.

60. Lichtenstein controlled the content of these dashboards.

61. For each investor, the dashboards displayed the total amount the investor invested in the Fund, the purported value of that investment, the annualized return percentage, and a graph to show the value of the investment over time.

62. These dashboards were accessible to investors online during the Relevant Period and were updated on a monthly basis.

63. Lichtenstein used these false dashboards to corroborate his oral misrepresentations to Taraxa investors that the Fund had positive returns and that the value of their investment in the Fund had increased.

64. Below are illustrative examples of how Lichtenstein misrepresented the performance of the Fund to Taraxa investors.

**i. Investor A**

65. On or around May 25, 2023, Investor A invested $40,000 in the Fund.

66. Throughout the Relevant Period, in repeated conversations, Lichtenstein led investor A to believe that his investment was growing in value.

67. In addition, at the end of 2023, Lichtenstein provided Investor A with a false tax document purporting to show that his $40,000 investment had grown to over $100,000.

68. Lichtenstein caused Investor A's dashboard to reflect that, over time, his investment had grown in value.

69. These representations regarding the value of Investor A's investment were false and misleading because—in addition to the depletion of Fund assets as a result of Lichtenstein's misappropriation—the Fund's trading performance was not profitable during the time period following Investor A's investment in Taraxa.

70. Lichtenstein's misrepresentations as to the Fund's performance were an important factor in Investor A's decision to invest an additional $45,000 into the Fund on or around January 26, 2024.

71. As of August 2024, Investor A's dashboard reflected historical investment growth throughout the Relevant Period:



72. The dashboard's depiction of Investor A's investment performance was false and misleading because, as Lichtenstein knew or recklessly disregarded by virtue of conducting the relevant trades, controlling Taraxa's bank and brokerage accounts, and misappropriating Fund assets, Investor A's interest in the Fund was worthless by May 2024.

**ii. Investor E**

73. In or around December 2023, Investor E invested at least $37,000 in the Fund.

74. Throughout the Relevant Period, Lichtenstein led Investor E to believe that his investment was growing in value.

75. At the end of 2023, Lichtenstein provided Investor E with a false tax document purporting to show that his initial investment had grown by over $20,000.

76. Lichtenstein also caused Investor E's online dashboard to reflect that, over time, his investment had grown in value.

77. These representations regarding the value of Investor E's investment were false and misleading because—in addition to the depletion of Fund assets as a result of Lichtenstein's misappropriation—the Fund's trading performance was not profitable during the time period following Investor E's investment in Taraxa.

78. As of August 2024, Investor E's dashboard reflected historical investment growth throughout the Relevant Period:



79. The dashboard's depiction of Investor E's investment was false and misleading because, as Lichtenstein knew or recklessly disregarded by virtue of conducting the relevant trades, controlling Taraxa's bank and brokerage accounts, and misappropriating Fund assets, Investor E's interest in the Fund was worthless by May 2024.

**iii. Investor F**

80. In or around May 2023, Investor F used $150,000 of his retirement savings to invest in the Fund.

81. Throughout the Relevant Period, Lichtenstein consistently advised Investor F that his investment was "doing great" and used the dashboard he created for Investor F to support his claim of positive returns.

82. Indeed, Lichtenstein caused Investor F's dashboard to reflect that his investment had grown at a 409% rate of return in a little over a year from the time of his May 2023 investment.

83. These representations regarding the value of Investor F's investment were false and misleading because, as Lichtenstein knew or recklessly disregarded by virtue of conducting the relevant trades, controlling Taraxa's bank and brokerage accounts, and misappropriating Fund assets, the Fund's trading was not profitable during the time period following Investor F's investment in Taraxa, and Investor F's interest in the Fund was worthless by May 2024.

**C. Lichtenstein Misrepresented How He Would Use Lightstone Investors' Money**

84. Similar to his conduct with respect to Taraxa, Lichtenstein orally represented to Lightstone investors that he would invest their money in securities using a day trading strategy that he claimed to have profited from personally.

85. These representations regarding Lichtenstein's use of investors' funds were important to their decisions to purchase Lightstone Notes.

86. Contrary to Lichtenstein's representations, throughout the Relevant Period

Lichtenstein invested at most $10,000 out of the over $300,000 he raised through Lightstone.

87. Meanwhile, Lichtenstein used approximately $98,000 of Lightstone investor funds for his personal expenses and at least $200,000 for Ponzi-like payments that gave the false appearance that Lightstone was generating sufficient trading revenue to fulfill its interest obligations under the Notes.

88. For example, on or around March 1, 2023, Investor F purchased $30,000 of Lightstone Notes by transferring funds to a Lightstone bank account.

89. Within one week of this deposit Lichtenstein used $25,000 of Investor F's money to make a Ponzi-like payment to a different Lightstone investor.

90. In addition, on or around August 24, 2023, Investor G purchased $25,000 of Lightstone Notes by wiring her investment to a Lightstone bank account.

91. Within two weeks of this deposit, Lichtenstein misappropriated nearly all of Investor G's $25,000 investment by transferring over $14,000 to Lichtenstein's personal bank accounts and using over $10,000 of Investor G's money to make Ponzi-like payments to two other Lightstone investors.

92. On or around September 22, 2023, Investor H purchased $25,000 of Lightstone Notes by wiring her investment to a Lightstone bank account.

93. By just one week later, Lichtenstein had withdrawn $22,000 of Investor H's money out of the Lightstone bank account and deposited it into his personal accounts.

94. Lichtenstein's Ponzi-like payments gave investors confidence in the legitimacy of Lightstone and in some cases caused them to increase their investments.

III. **Lichtenstein Misappropriated Investor Money to Fund his Lifestyle**

95. Out of the approximately $2.7 million that Lichtenstein raised from investors in Taraxa and Lightstone, he misappropriated over $966,000 for personal use.

96. Lichtenstein began misappropriating money from Taraxa and from Lightstone investors by at latest May 2023.

97. Throughout the Relevant Period, Lichtenstein regularly transferred investor funds from Taraxa and Lightstone bank accounts to his personal bank accounts and made direct debits from the Taraxa and Lightstone accounts to pay for personal expenses.

98. For example, on or around May 25, 2023, Investor A invested $40,000 in the Fund, which was deposited in a Taraxa bank account, but within 12 days Lichtenstein had used approximately $13,000 of that money to pay for personal expenses and to make transfers to his personal bank account.

99. On or around December 29, 2023, Investor E invested at least $37,000 in the Fund, which was deposited in a Taraxa bank account, but within a week Lichtenstein had transferred $17,000 of it to his personal bank account.

100. On or around May 31, 2024, Investor G purchased $11,000 in Lightstone Notes, which was deposited in a Lightstone bank account, but on the same day Lichtenstein misappropriated the majority of Investor G's money by transferring it to his personal bank accounts.

101. In total, during the Relevant Period, Lichtenstein used funds from Taraxa and Lightstone investors to pay approximately $315,000 in credit card purchases; $99,000 in mortgage payments; $63,000 in expenditures at bars, restaurants, and lounges; and $21,000 in travel expenses. Lichtenstein also withdrew approximately $150,000 in cash from Taraxa and Lightstone accounts.

102. Even after Lichtenstein began misappropriating money from the Taraxa and Lightstone bank accounts, he continued to solicit investors by falsely and misleadingly representing to them that their money would be used to invest and trade in securities.

### IV. Lichtenstein Admitted to His Fraudulent Conduct After His Scheme Collapsed

103. By in or around July 2024, Lichtenstein had drained the Taraxa and Lightstone bank

and brokerage accounts of almost all their funds through misappropriation, Ponzi-like payments, and unsuccessful trading.

104. Around that time, Lichtenstein admitted to Taraxa investors in an e-mail dated July 24, 2024, that he falsely inflated investor earnings in April and May of 2024.

105. Nonetheless, Lichtenstein claimed in oral conversations with some investors that their principal remained intact. This was false because Taraxa and Lightstone had virtually no assets by July 2024.

106. In his July 24, 2024 e-mail to investors, Lichtenstein also committed to convening an oversight board consisting "of two current investors who ha[d] a background in and understanding of market trading" in order to ensure future transparency and propriety of Taraxa and Lightstone investments.

107. Although Lichtenstein formed the oversight board, he never gave its members access to the Taraxa and Lightstone brokerage accounts.

108. When several investors attempted to redeem their investments during July and August 2024, Lichtenstein was unable to meet the redemption requests.

109. Ultimately, in or around September 2024, in a phone call between Lichtenstein and Investor A, Lichtenstein admitted that the Taraxa dashboards were fabricated, that the investments he did make suffered "[a] little bit over a million" in losses, and that he used the remainder of the money "to cover his lifestyle" expenses and the Ponzi-like payments made to investors.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

110. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 109.

111. By engaging in the conduct described above, Lichtenstein, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or

communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

112. By reason of the foregoing, Lichtenstein, directly or indirectly, has violated—and unless enjoined Lichtenstein will again violate—Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

113. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 109.

114. By engaging in the conduct described above, Lichtenstein, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

115. By reason of the foregoing, Lichtenstein, directly or indirectly, has violated—and unless enjoined Lichtenstein will again violate—Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

116. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 31, 43 through 83, and 95 through 109.

117. At all relevant times, Lichtenstein was an investment adviser, under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

118. By engaging in the conduct described above, Lichtenstein, directly or indirectly, by the use of means or instrumentalities of interstate commerce or the mails, (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

119. By reason of the foregoing, Lichtenstein, directly or indirectly, has violated—and unless enjoined Lichtenstein will again violate—Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder

120. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 31, 43 through 83, and 95 through 109.

121. At all relevant times, Lichtenstein was an investment adviser, under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)], to a pooled investment vehicle, as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

122. By engaging in the conduct described above, Lichtenstein knowingly, recklessly, or negligently (i) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled

18

investment vehicle, and/or (ii) engaged in one or more acts, practices, or courses of business that were fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

123. By reason of the foregoing, Lichtenstein, directly or indirectly, has violated—and unless enjoined Lichtenstein will again violate—Advisers Act Sections 206(4) [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Lichtenstein and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80(b)-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

Ordering Lichtenstein to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Lichtenstein to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9];

**IV.**

Permanently restraining and enjoining Lichtenstein from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**V.**

Permanently restraining and enjoining Lichtenstein from directly or indirectly, acting as or being associated with any investment adviser.

**VII.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
October 22, 2025

/s/ Peter A. Mancuso
Thomas P. Smith, Jr.
Celeste Chase
Peter A. Mancuso
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5562 (Mancuso)
Email: MancusoPe@sec.gov

*Attorneys for Plaintiff*